Walter DULANEY, Plaintiff,

v.

**MIAMI–DADE COUNTY and International Association of Firefighters, Local 1403, Defendants.**

**Case No. 09–23259–CIV.**

United States District Court,
S.D. Florida.

May 5, 2011.

Jennifer E. Daley, Karen Coolman Amlong, Rani Nair Bolen, William Robert Amlong, Amlong & Amlong, Fort Lauderdale, FL, for Plaintiff.

Michael Brian Nadler, Miami, FL, Mark William Floyd, Shellie Lynne Sewell, Mierzwa & Associates, P.A., Lake Worth, FL, for Defendants.

### ORDER GRANTING DEFENDANT MIAMI–DADE COUNTY'S MOTION FOR SUMMARY JUDGMENT (D.E. 72) AND GRANTING LOCAL 1403'S MOTION FOR SUMMARY JUDGMENT (D.E. 74)

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendants' motions for summary judgment. On January 18, 2011, Defendant Miami–Dade County (the "County") filed its Motion for Summary Judgment ("County's Motion," D.E. 72). Plaintiff Walter Dulaney ("Dulaney") filed his response in opposition (D.E. 87), on February 5, 2011, to which the County filed its reply (D.E. 99), on February 17, 2011.[1] On January

---

1. The County filed its Statement of Undisputed Facts ("County SOF") as part of its Motion. (*See* D.E. 72.) Dulaney filed an Amended Statement of Disputed Material Facts ("Pl. Amended SOF," D.E. 111), on February 25, 2011.

19, 2011, Defendant the International Association of Firefighters, Local 1403 (the "Union"), filed its Motion for Summary Judgment ("Union's Motion," D.E. 74). Dulaney filed his response in opposition (D.E. 90), on February 7, 2011, to which the Union filed its reply (D.E. 98), on February 17, 2011.[2] Having considered the motions for summary judgment, related pleadings, and the record, the Court finds as follows.

## I. Background[3]

This case involves allegations by a former Miami–Dade firefighter that the County and the Union[4] discriminated against him based upon his perceived drug use. Dulaney contends the County failed to set up a required psychological evaluation for him and terminated him because they perceived him as being a drug user. Dulaney further contends the Union discriminated against him by discouraging the County from setting up a psychological evaluation and informing it that Dulaney was a drug addict. Defendants contend Dulaney was terminated for "job abandonment" and deny any perceived drug use.

On June 27, 2006, Dulaney noticed a rash had developed covering his arms and chest and sought treatment from the Wellness Center, a clinic operated by the Union providing medical and rehabilitation services to Miami–Dade Fire Rescue ("MDFR") employees. At the Wellness Center, Dulaney was seen by Dr. Michele Grundstein ("Grundstein"). The rash was classified as work-related and Dulaney's treatment was covered by worker's compensation. On July 20, 2006, Grundstein authored a progress note indicating her opinion that the rash had "basically resolved" and he would be able to work his next assigned shift. (*See* D.E. 72–1 at 3.) Nevertheless, the rash left noticeable scars and pock marks.

On August 20, 2006, Dulaney complained that he injured his wrist while on duty. Grundstein again treated Dulaney at the Wellness Center. On August 25, 2006, Grundstein authored another progress note indicating her opinion that Dulaney was cleared to return to full work duty with no restrictions. (*See* D.E. 72–2 at 3.) Dulaney returned to work.

On September 1, 2006, Dulaney began to suffer from a fever and sore throat while on duty. (*See* D.E. 72–3.) Dulaney's symptoms worsened over the next couple of days and on September 3, 2006, he went to Jupiter Hospital. (*See* D.E. 72–4.) Dulaney was subsequently transported to St. Mary's Medical Center where he was diagnosed with a peritonsillary cellulitis/abcess. Physicians at St. Mary's prescribed medication for Dulaney and he was sent home. (*See* D.E. 72–5, 72–6.) The hospital discharge instructions directed Dulaney to make a follow-up appointment with Dr. Curtis Emmer ("Emmer"). (*See* D.E. 72–6.) The following day, Dulaney wrote a

---

On March 2, 2011, Dulaney also filed a Notice of Supplemental Authority, attaching the U.S. Supreme Court's decision in *Staub v. Proctor Hospital,* —— U.S. ——, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), as relevant to the issue of a "cat's paw" theory of discrimination. (*See* D.E. 113.)

**2.** The Union filed its Statement of Undisputed Facts ("Union SOF") on January 19, 2011 (*See* D.E. 73.) Dulaney filed his Statement of Disputed Material Facts ("Pl. SOF," D.E. 91), on February 7, 2011. The most charitable thing the Court can say about the Parties' statements of fact is that they loosely conform with Local Rule 7.5.

**3.** The following facts are undisputed unless otherwise noted.

**4.** The Union is a collective bargaining agent for firefighters, lieutenants, captains, chief fire officers, pilots, co-pilots, dispatchers, and dispatcher supervisors employed by Miami–Dade Fire Rescue. (*See* Union SOF at ¶ 1.)

memorandum to Battalion Chief Todd Garofalo ("Garofalo") explaining his medical condition and his opinion that he was unsure whether he would be able to work his next shift scheduled for September 7, 2006. (*See* D.E. 72–3.)

On September 5, 2006, Dulaney consulted Emmer, an ear, nose, and throat ("ENT") physician located near his home. (*See* D.E. 72–7.) Emmer diagnosed Dulaney with a "right peritonsillar abcess," drained the abcess, and prescribed several antibiotics and pain medications. (*See* Emmer Dep., D.E. 72–13 at 9.) On September 6, 2006, Dulaney was seen by Dr. Dalisla Soto ("Soto") at the Wellness Center. (*See* D.E. 72–8, 72–9.) Soto prescribed pain medication for Dulaney and referred him to an outside ENT specialist. (*See* D.E. 72–9.) She did not refer him to an infectious disease specialist although Dulaney contends either Soto or Grundstein informed him they would do so.

On September 18, 2006, Dulaney again saw Emmer. At that time, Emmer noted that Dulaney appeared to be "stable" and recommended that he undergo surgery to remove his tonsils in order to prevent recurring infection. (*See* D.E. 72–13 at 9–10.) That surgery was scheduled for September 25, 2006. (*See* D.E. 72–14.) Due to Dulaney needing pre-operative and post-operative care, Emmer gave Dulaney a Certification to Return to Work/School form indicating Dulaney would be able to return to work on October 11, 2006. (*See* D.E. 72–15.) Dulaney decided to not have his tonsils removed and did not undergo any surgery.

On September 19, 2006, a worker's compensation claims adjuster sent a letter to Dulaney informing him that an appointment had been scheduled for him with an authorized worker's compensation ENT specialist, Dr. Stephen Guilder ("Guilder"), for September 28, 2006, in connection with his "on-the-job injury." (*See* D.E. 72–11 at 2.) Dulaney did not attend this appointment. (*See* D.E. 72–12.) Dulaney claims he never received notice of it.

On September 22, 2006, an employee with Risk Management contacted Emmer's office. (*See* D.E. 72–13 at 10.) Emmer testified that he returned the call on September 26, 2006. (*Id.*) Emmer informed Risk Management that Dulaney's medical condition was personal and unrelated to any on-the-job injuries. In an October 4, 2006, e-mail, an MDFR occupational safety and health supervisor named Hillary Julien ("Julien") expresses frustration with regard to her attempts to contact Dulaney and indicates she and another employee left voice messages for Dulaney regarding his appointment with Guilder.[5] (*See* D.E. 72–12.)

Dulaney subsequently did not return to work although he claims he was told he could not go back to work unless either Soto or Grundstein signed off on his return. (*See* Pl. SOF at ¶¶ 14–15, 18; Pl. Dep., D.E. 72–17 at 69–70.) Under the County's personnel rules, an employee absent without authorization for three consecutive days is subject to dismissal for job abandonment. (*See* D.E. 72–18.) The County's job abandonment policy requires the County to undertake efforts to contact an employee, including telephone calls and home visits if necessary, who has failed to report their absences. (*Id.*) The policy further provides that following three unauthorized absences, the employee shall be notified via certified letter that unless the employee reports to work or provides a satisfactory reason for their absence, they will be considered as having abandoned their position. (*Id.*)

---

5. Many of the e-mails submitted and many of the witnesses deposed described at least some degree of difficulty in contacting Dulaney during the relevant time period.

In early October 2006, Dulaney's supervisor, Chief Christine Rogers ("Rogers") was informed that Dulaney's medical condition was personal and that any subsequent absences would be counted as sick time. (*See* D.E. 72–20; Rogers Dep., D.E. 72–21 at 11.) Rogers testified that she had several conversations with Garofalo regarding his frustration and inability to contact Dulaney. (Rogers Dep., D.E. 72–21 at 12.) It was at this point that Rogers also attempted to contact Dulaney and left several voice messages for him. (*Id.*) Meanwhile, at the union hall, rumors spread regarding Dulaney's possible drug use. There is also evidence that Dulaney was undergoing some personal issues related to his recent divorce and home foreclosure. (*See* Pena Dep., D.E. 72–22 at 11, 41; Pl. Dep., D.E. 72–17 at 58.)

On approximately October 3, 2006, two firefighters, a lieutenant named Mitch Perlstein ("Perlstein") and another firefighter and occupational health specialist[6] named Orlando Pena ("Pena"), conducted an unannounced visit to Dulaney's home.[7] (*See* D.E. 72–12; Pena Dep., D.E. 72–22 at 9–10.) Pena testified that Perlstein was a mutual friend and had previously acted somewhat as a mentor for Dulaney. (*See* Pena Dep., D.E. 72–22 at 8, 26.) The visit was in response to several rumors Pena had heard from firefighters present at the union hall to the effect that Dulaney was missing work because he was using drugs. (Pena Dep., D.E. 72–22 at 9–11; Perlstein Dep., D.E. 91–2 at 17–19.) Pena and Perlstein did not observe any indications of drug use and found Dulaney to be in good

health upon their visit. Dulaney continued to not report to work. Rogers testified that she told Garofalo to maintain Dulaney on the payroll and attendance records as "sick" as a courtesy and in order to permit him to work through his personal problems. (Rogers Dep., D.E. 72–21 at 16–18.) Dulaney again visited the Wellness Center in December 2006 due to a peritonsillar abcess. (Grundstein Dep., D.E. 84–2 at 18.) Soto examined Dulaney and lanced the abcess. (*Id.*)

As August 2007 approached, MDFR began to implement a new automated system for managing personnel payroll and attendance. This new system did not permit supervisors to carry employees on the payroll and attendance records, or "PARs," who were not actually showing up for their shift on an operational unit. (Rogers Dep., D.E. 72–21 at 25.) Because of this change, Dulaney's continued absence was going to come to the "forefront" and Rogers was advised that either Dulaney needed to return to work or be processed for job abandonment. (*Id.*) The County contends that Rogers contacted other battalion chiefs in an effort to contact Dulaney and advise him of what was going on and of the fact that he needed to report or contact her. Dulaney contends that at some point he was contacted and told to report to the Wellness Center on July 30, 2007, for release back to duty. (Pl. Dep., D.E. 72–17 at 7.)

On July 30, 2007, Dulaney visited the Wellness Center and was again seen by Grundstein. He was seen as a private patient. (*See* Salom Affidavit, D.E. 72–24 at 2;[8] Grundstein Dep., D.E. 84–2 at 24.)

---

**6.** Pena handled worker's compensation issues for firefighters at the Wellness Center and served as the Wellness Center Coordinator. (Pena Dep., D.E. 72–22 at 5–7; D.E. 73 at 2.)

**7.** Perlstein testified that he had made one prior unannounced visit to Dulaney's home by himself sometime during the summer of 2006 although the timing is unclear. This visit was at Pena's request. Perlstein testified that he

found Dulaney in good condition and reported that fact back to Pena. (*See* Perlstein Dep., D.E. 91–2 at 14–17, 38.)

**8.** To the extent Dulaney objects to Salom's affidavit, the Court finds such objection without merit. Salom was employed as the Fire Rescue Occupational Health and Wellness Manager since September 2006 and is re-

As a result of the visit, Grundstein concluded that Dulaney had suffered a severe depressive episode related to his divorce and personal problems. (Grundstein Dep., D.E. 84–2 at 26–27; D.E. 85–4 at 2.) Grundstein informed Dulaney that he would need to be cleared by a psychiatrist in order to return to work and referred him for a psychological evaluation. (Grundstein Dep., D.E. 84–2 at 27–29.) The County contends this evaluation was never forwarded to anyone with MDFR, the County's Risk Management division, or any of Dulaney's supervisors because Dulaney was seen as a private patient. (*See* Salmon Affidavit, D.E. 72–24 at 3.) The County also contends that despite making contact with Division Chief of Employee and Community Affairs Patty Frosch ("Frosch") after the visit, Dulaney still failed to contact any of his supervisors, anyone with Human Resources, or anyone in management in order to advise them when he would return to work. The County contends Dulaney made no effort to schedule or undergo the psychological evaluation in order to return to work.[9] Dulaney believes that either he physically delivered Grundstein's evaluation or it was supposed to be faxed to the occupational health department. (*See* Grundstein Dep., D.E. 84–2 at 27–28; Pl. SOF at ¶ 60.) According to Dulaney, Frosch communicated to him that a plan would be formulated allowing him to return to work and such plan would be communicated to him within the next couple of weeks. (*See* D.E. 85–5 at 3; Frosch Dep., D.E. 88–1 at 25–26.) In the end, Dulaney believes MDFR or the Wellness Center were responsible for scheduling his psychological evaluation.

In August 2007, MDFR began to process Dulaney for job abandonment. (*See* D.E. 85–5; D.E. 88–2.) On August 24, 2007, Rogers sent an e-mail to MDFR Human Resources Division Manager Tarlesha Smith ("Smith"), Frosch, and others indicating her opinion that they had "done everything possible to work with Lt. Dulaney and that there is no other option than to process him for 'Job Abandonment,'" due to his failure to report for duty since August 2006 and his failure to report to work or return phone calls. (D.E. 88–2 at 2.)

On September 10, 2007, Rogers sent a letter to Dulaney via certified mail informing him that he should report to work or contact Operations North Division within seven days or he would be presumed to have abandoned his position. (*See* D.E. 72–26.)

On September 20, 2007, Rogers sent a second letter to Dulaney via certified mail informing him again that he had seven days to report to work or contact his Division or be considered to have abandoned his position. (*See* D.E. 72–27.)

On September 26, 2007, Dulaney's worker's compensation attorney, Bram Gechtman ("Gechtman"), sent a letter to Rogers, Smith, and Synthia Sears, in response to the letters from the MDFR. (*See* D.E. 72–28.) Gechtman's letter states Dulaney's position that he was prohibited from returning to work and the County had failed to schedule Dulaney's psychological evaluation. The letter also indicates several attempts had been made to contact Smith. Gechtman also states in an affidavit that he made several attempts to contact Smith

---

sponsible for the management and operations of the Wellness Center. Her statements regarding the Wellness Center's procedures and policies, and her statement that Dulaney was seen as a private patient, are sufficiently based upon personal knowledge.

9. Dulaney's expired paramedic license or certification was also a concern. (*See* D.E. 88–2 at 2.)

and Rogers. (*See* D.E. 88–5.) At this point, the matter was referred to the Miami–Dade County Attorney's Office and Gechtman's attempts at communication were not returned. (*See* D.E. 88–4; Smith Dep., D.E. 89–6 at 106–108.)

On December 3, 2007, Lorenzo sent a letter to Dulaney via certified mail terminating him for job abandonment. (*See* D.E. 72–29.) Lorenzo states in an affidavit that he terminated Dulaney "because he failed to report to duty for more than a year" and that he "had no knowledge that Walter Dulaney used drugs or was thought to use drugs."[10] (D.E. 72–30.) Dulaney subsequently sought worker's compensation benefits related to his peritonsillary abcess. On January 19, 2009, a hearing was held regarding Dulaney's injuries. On February 20, 2009, a Final Compensation Order was issued denying benefits. (*See* D.E. 72–31.) Dulaney claims that he only learned he was terminated on March 26, 2008, during mediation of the worker's compensation claim. (*See* EEOC Charge of Discrimination, D.E. 98–9 at 1.)

On July 9, 2008, Dulaney filed a Charge of Discrimination with the EEOC and Florida Commission on Human Rights. (*Id.*) On July 28, 2009, the EEOC issued a Right to Sue letter. (*See* Union SOF at ¶ 15; Pl. SOF at ¶ 17.)

On October 27, 2009, Dulaney commenced the instant litigation alleging the County and the Union discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.01, *et seq.* (*See* Complaint, D.E. 1.)

Dulaney raises three claims against the County. Count I of the Complaint alleges the County discriminated against Dulaney in violation of the ADA based upon his perceived status as a drug user by failing to schedule a psychological evaluation for him and by terminating him.[11] Count II of the Complaint incorporates the preceding paragraphs and alleges the County discriminated against him based on handicap in violation of the FCRA. Finally, Count V of the Complaint alleges the County discriminated against Dulaney based on handicap in violation of the FCRA but cites to 42 U.S.C. § 12132. Dulaney alleges the County's failure to schedule an evaluation and his termination violated his rights to be free from denial of services, programs, or activities of a public entity in violation of 42 U.S.C. § 12132. Although the Complaint intersperses references to both the ADA and the FCRA and appears to assert primarily duplicative claims, the essence of Dulaney's Complaint is that by failing to schedule a psychological evaluation and by terminating him, the County discriminated against him based on disability, namely his perceived drug use.

Dulaney also raises two claims against the Union. Count III of the Complaint alleges the Union discriminated against him by discouraging the County from set-

---

**10.** To the extent Dulaney objects to Lorenzo's affidavit as inconsistent with his deposition testimony, the Court finds such objections without merit. Lorenzo's deposition testimony was simply that he had no recollection of Dulaney's termination aside from his signing the memorandum approving Dulaney's termination based upon job abandonment. (*See* D.E. 86–1 at 8–9.)

**11.** The Complaint's format appears to have caused some confusion among the Parties.

Count I of the Complaint begins immediately below the title of the pleading and includes allegations concerning jurisdiction, venue, and an explanation of the Parties. Thus, Defendant states in its Motion its position that the Complaint only asserts four claims in total, and only two FCRA claims against the County. (*See* Motion at 1–2.) Dulaney responds that he raises five claims in his Complaint, including three claims against the County pursuant to both the ADA and FCRA. (*See* Response at 1 n. 1.)

ting up a psychological evaluation and by informing the County that he used drugs, in violation of the ADA. Count IV raises identical allegations as violations of the FCRA. Defendants have now moved for summary judgment.

## II. Motions for Summary Judgment

### A. County's Motion for Summary Judgment

The County moves for summary judgment on the grounds that Dulaney cannot establish a *prima facie* case of discrimination. The County argues there is no evidence supporting a finding that the County regarded Dulaney as having a drug addiction and the only evidence in the record demonstrates the County terminated him because he failed to appear for work for more than a year. The County argues Dulaney has failed to demonstrate that this legitimate non-discriminatory reason for termination was pretextual. The County also argues that Dulaney cannot establish he was a qualified individual under the ADA since an essential function of his job included reporting for duty, which he failed to do. Finally, the County asserts Dulaney should be precluded from collaterally attacking the denial of his worker's compensation claim in state court pursuant to the *Rooker–Feldman* doctrine and Dulaney is precluded from challenging such issues as whether his injuries were related to his job, whether the County relieved him for duty, and whether the County was supposed to set up any appointments for him.

In response, Dulaney argues the County waived any collateral estoppel defenses as they were not raised as an affirmative defense in the County's Answer. (*See* County's Answer, D.E. 6.) Dulaney also objects to the County's use of affidavits from Veronica Salom ("Salom") and Herminio Lorenzo ("Lorenzo") as not based on personal knowledge and/or in conflict with prior deposition testimony. More importantly, Dulaney asserts genuine issues of material fact exist as to whether: (1) the County regarded Dulaney as having a drug addiction; (2) the County's termination for "job abandonment" was pretextual; (3) the County regarded his disability as affecting a major life activity; and (4) he is precluded from challenging issues raised during his worker's compensation proceeding. Dulaney states he has established the County perceived him as a drug user based upon the rash that developed on his arms, that the County and Union isolated him by removing him from work, and that County personnel on several occasions undertook unannounced visits to Dulaney's house at the direction of County management. He believes genuine issues of fact also exist as to whether the County perceived him as being disabled to the extent he could not return to work in any capacity. Moreover, Dulaney argues he is qualified under the ADA because the County created a "false barrier" that prevented him from returning to work. (D.E. 87 at 15.) As to whether the County's proffered reason for termination was pretextual, Dulaney asserts a "cat's paw" theory that Lorenzo's termination decision was merely a conduit for Rogers' discriminatory animus. Dulaney also believes pretext is demonstrated through: (1) testimony from himself and others that he desired to return to work; (2) evidence of his numerous attempts to return to work; (3) the County's failure to comply with its own policies; (4) evidence that Dulaney complied with instructions to stay away from other employees; and (5) evidence that the County failed to schedule an evaluation or develop a plan for him to return to work despite Grundstein's recommendations. Thus, Dulaney contends genuine factual issues exist precluding summary judgment.

In reply, the County argues Dulaney fails to dispute the "two most critical facts" in its case, namely that he did not report to work since September 2007 and he did not report to work because he was waiting for someone from the Risk Management Division to set up an appointment. (D.E. 99 at 1.) The County asserts these two facts demonstrate the decision to terminate him was divorced from any perceived disability. The County also asserts there is no evidence that Rogers, Lorenzo, or any Risk Management employee perceived Dulaney as having a disability based on alleged drug use. Thus, the County believes summary judgment is appropriate.

### B. Union's Motion for Summary Judgment

The Union moves for summary judgment on both claims. Because of its unique position as a labor union, the Union contends that Dulaney can only assert a disability discrimination claim against it under one of several theories: deliberate acquiescence, conspiracy, breach of the duty of fair representation, or retaliation. The Union argues Dulaney has failed to offer facts supporting any of these theories. Additionally, the Union believes Dulaney's claims fail because he cannot establish a *prima facie* case of discrimination against the County and there is no evidence his termination based on job abandonment was pretextual.

In response, Dulaney reiterates many of his prior arguments raised with regard to the County. According to Dulaney, the Union was integrally involved with fueling the perception and rumors that Dulaney was using drugs and needed to go to drug rehabilitation. As evidence, Dulaney points primarily to: (1) Gelabert's statement to Dulaney that the consensus between the County and the Union was that he needed to attend rehabilitation in order to keep his job; (2) the two unannounced visits to Dulaney's home; (3) the Union's alleged conversations with Grundstein; (4) the Union's involvement in the failure to formulate a plan for his return to work; and (5) the Union's failure to advise Dulaney of his termination or follow-up. Dulaney further argues that any jurisdictional challenges to a claim for unfair representation were waived.

In reply, the Union restates its position that there is no evidence supporting a *prima facie* case of discrimination against the Union based on an acquiescence theory of liability. The Union also argues that the scope of conduct alleged against the Union in the Complaint exceeds that contained in Dulaney's EEOC charge of discrimination and that any belated claim of breach of the duty of fair representation falls outside the Court's jurisdiction. Finally, the Union argues Dulaney has not demonstrated any factual issues with regard to pretext. Accordingly, the Union argues summary judgment is appropriate.

### III. Standard of Review

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142(1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.CIV.P. 56(a). The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

That party must demonstrate that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. 1348. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.* Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990) (citing *Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## IV. Discussion

■ The ADA generally provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Parties agree that the Union constitutes a covered entity. *See* 29 C.F.R. § 1630.2(b) and (c). 42 U.S.C. § 12132 prohibits discrimination in the provision of public services and states that, "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The FCRA, in part, makes it unlawful "for an employer: (a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status." Fla. Stat. § 760.10(1).[12]

---

**12.** Claims of discrimination based upon disability are analyzed under the same frame-

The ADA defines "disability" as meaning either:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).[13] Congress recently clarified the definition of "disability" such that, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).[14] In addition, the ADA "protects employees who are erroneously regarded as being current illegal drug users." *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 610 (10th Cir.1998); *Hill v. Hamilton County Pub. Hosp.*, 71 F.Supp.2d 936, 950 (N.D.Iowa 1999); *Jones v. Corrections Corp. of Am.*, 993 F.Supp. 1384, 1386 (D.Kan.1998); 42

work under both the ADA and FCRA. *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir.2000).

13. For purposes of the definition of "disability," the term "major life activities" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2).

14. Previously, numerous cases had adopted the approach that, "[f]or a plaintiff to prevail under the 'regarded as' theory of disability, she must establish two points: (1) that the perceived disability involves a major life activity, and (2) that the perceived disability is 'substantially limiting' and significant." *Luna v. Walgreen Co.*, 347 Fed.Appx. 469, 471 (11th Cir.2009) (citing *Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir.1999)); *see also, Collado v. UPS*, 419 F.3d 1143 (11th Cir.2005); *Loperena v. Scott*, 356 Fed.Appx. 240, 242 n. 5 (11th Cir.2009).

In 2008, Congress enacted the ADA Amendments Act of 2008, 110 P.L. 325, 122 Stat. 3553 (2008), effective January 1, 2009, in response to the Supreme Court's decisions limiting the scope of the ADA in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Among the amendments, Congress changed the definition of "disability" such that being "regarded as" having a disability no longer requires a showing that the employer perceived the individual to be substantially limited in a major life activity.

Although the County's allegedly discriminatory conduct occurred prior to the ADA Amendments Act of 2008, the Complaint in this matter was not filed until October 2009, well after the effective date of the amendments. Neither side has discussed or briefed the effect of the 2008 amendments on Dulaney's claims. In *Fikes v. Wal–Mart, Inc.*, 322 Fed.Appx. 882, 883 n. 1 (11th Cir.2009), the Eleventh Circuit acknowledged the 2008 Amendments but declined to retroactively apply them and instead "look[ed] to the ADA as it was in effect at the time of the alleged discrimination." *see also, Morales v. Ga. Dep't of Human Res.*, 2010 WL 4639279 at *3 n. 3, 2010 U.S. Dist. LEXIS 118154 at *11 n. 3 (M.D.Ga.2010); *Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 734 n. 4 (8th Cir.2010); *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir.2009); *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir.2009); *E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 469–70 n. 8 (5th Cir.2009). Because the ADA Amendments Act of 2008 appears to merely clarify the scope of the "disability" definition, it is unclear whether application of the ADA as it was in effect at the time of the alleged discrimination would truly alter the analysis despite the fact that case law previously interpreted it differently. Ultimately, the issue is academic as the Court finds Dulaney has failed to set forth a *prima facie* case of discrimination or demonstrate a factual issue as to pretext. Thus, the Court need not discuss the Parties' arguments regarding whether the County regarded Dulaney as substantially limited in the major life activity of working.

U.S.C. § 12114(b). Finally, labor unions may be held liable for discrimination where an employer engages in unlawful discrimination and the union purposefully or deliberately acquiesced in the prohibited conduct. *See Romero v. Union P. Railroad*, 615 F.2d 1303, 1311 (10th Cir. 1980); *Greenier v. PACE, Local No. 1188*, 201 F.Supp.2d 172, 182 (D.Me.2002); *see also, Weaver v. Leon County Classroom Teachers Ass'n*, 680 So.2d 478 (Fla. 1st DCA 1996).

■ The Court employs the same burden-shifting framework used to analyze Title VII employment discrimination claims for ADA discrimination claims. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir.2007); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to establish a prima facie case of discrimination under the ADA, Dulaney "must demonstrate that he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability." *Greenberg v. Bell-South Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir.2007) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir.2000)). "Once a plaintiff establishes a prima facie case of discrimination, the defendant-employer must articulate a legitimate, non-discriminatory reason for the challenged action." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir.2001). "If the employer articulates non-discriminatory reasons, the plaintiff must then 'proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual.'" *Palmer v. Albertson's LLC*, 418 Fed.Appx. 885, 887, 2011 WL 1045780 at *1, 2011 U.S.App. LEXIS 6125 at *4 (11th Cir. Mar. 23, 2011) (citing *Wascura*, 257 F.3d at 1243).

■ The Court finds Dulaney has failed to establish a *prima facie* case of disability discrimination based upon perceived drug use. First, viewing the evidence in the light most favorable to Dulaney, all of the evidence demonstrates that at best any perceived drug use consisted merely of rumors circulating among a small group of fellow firefighters. Dulaney testified that Manny Gelabert ("Gelabert"), a union representative,[15] had told him that the "consensus" was that he needed to go through drug rehabilitation. (Pl. Dep., D.E. 72–17 at 34.) Pena testified that there was a lot of "talking" and "innuendo" and he had heard "some things being bantered around in our union building" regarding Dulaney's drug use. (*See* Pena Dep., D.E. 72–22 at 8–9.) Nevertheless, Pena conceded that anything he heard was "through the firefighter rumor mill" and that he did not hear anything regarding drugs from Frosch or any officer with the fire department. (*Id.* at 46–47.) He also testified that the unannounced visits to Dulaney's home were his idea. (*Id.* at 9–10.) Similarly, Perlstein testified only regarding "informal conversations" with Gelabert and Garofalo and learning from other firefighters that another union official Stan Hills ("Hills") had made a comment about Dulaney needing to go to rehab. (*See* Perlstein Dep., D.E. 91–2 at 9–11, 28–29.)

On the other hand, Dulaney provides scant evidence that any decision-makers or anyone in MDFR management perceived him as a drug user or was even aware of the rumors. Lorenzo, who was responsible for the decision to terminate Dulaney, was unaware of any rumors. Rogers testified that although she was aware of drug

---

**15.** Gelabert held the title of Benefits Officer, an elected position with the Union, during the relevant time period. (*See* D.E. 73 at 2.)

use rumors in 2006, she did not believe them and instructed Dulaney's battalion chief to count Dulaney as "sick" on the PARs as a courtesy due to his personal issues. (Rogers Dep., D.E. 72–21 at 16–17.) Roger's knowledge of drug abuse rumors in October 2006 is temporally remote from the eventual decision to terminate Dulaney almost a year later in August 2007. In other words, evidence that Rogers heard rumors in late 2006 but did not decide to terminate Dulaney until almost a full year later does not support an inference that a perceived drug addiction had anything to do with the decision to terminate. Frosch testified that she never heard any allegations of drug use from anyone at the County or the Union. (Frosch Dep., D.E. 88–1 at 48.) Tarlesha Smith testified she never spoke with Pena, Perlstein, Gelabert, or Hills regarding Dulaney. (Smith Dep., D.E. 89–6 at 22–23.) Gelabert contradicted Dulaney's testimony, indicating he never spoke with Dulaney regarding allegations of drug use. (Gelabert Dep., D.E. 73–3 at 16.) Gelabert also testified he never spoke to Rogers regarding Dulaney and he never spoke to Hills regarding any rumors of drug use. (*Id.* at 12, 24.) Gelabert further testified that rumors of drug use were frequent when firefighters failed to show up for work but he himself had not heard any rumors until he spoke with Pena. (*Id.* at 13.) Grundstein also testified she was not aware of any perceived drug use. (Grundstein Dep., D.E. 84–2 at 24.) In sum, the overwhelming evidence demonstrates any perceived drug use was limited to rumors circulating among a small group of Dulaney's fellow firefighters. There is also no nexus between these rumors and any adverse employment action.

■ Even assuming Dulaney has demonstrated a *prima facie* case of discrimination, the County has articulated a legitimate, non-discriminatory reason for his termination and Dulaney has not raised any factual issues as to whether that reason was pretextual. Dulaney was terminated for "job abandonment," a legitimate non-discriminatory reason. Dulaney failed to report to work after September 2006. The record evidence indicates numerous attempts were made to contact Dulaney without success. On September 10, 2007, the County sent him a letter indicating he would be terminated for job abandonment unless he reported for work or contacted his division. On September 20, 2007, the County sent him another letter warning him again that he faced job abandonment. Finally, the County terminated Dulaney on December 3, 2007, for job abandonment. There is no evidence of any connection between these actions on behalf of the County and any perceived drug use. There is also no evidence that the County prevented him from scheduling a psychological evaluation or otherwise failed to schedule one for him when it was required to do so. Rather, the undisputed evidence demonstrates Dulaney failed to report to work after he was cleared to return by his own physician in 2006. The County continued to carry him as "sick" on its payroll and attendance records until a change in its automated system occurred in August 2007. Aside from Dulaney's visit to the Wellness Center in July 2007, there is little evidence of any effort to attempt to report for duty, to contact his supervisors or anyone in his chain of command, or schedule the psychological evaluation necessary to report back to work. After he received warnings from the County in September 2006 that he was facing termination, Dulaney did not report to work. Although he testified that he attempted to call his superiors, there is no evidence of this other than his own testimony. More tellingly, he had his attorney contact the County on his behalf. By that point his paramedic license had expired. He also did not undertake any efforts to schedule

the psychological evaluation or follow-up with regard to that appointment. Even if it was somehow reasonable for Dulaney to believe he had to wait until someone set up a psychological evaluation for him, it is undisputed that he failed to take any steps to return to work in the period between the County's warning letters sent in September 2007 and his eventual termination on December 3, 2007. In sum, there is no evidence that any decision to terminate him or set up a psychological evaluation was based on any perceived drug use or anything other than his own failure to report to work or communicate with those in his department. Thus, Dulaney has failed to demonstrate any factual issues as to whether the County's rationale for terminating him was pretextual.

■ Summary judgment is also appropriate on the claims against the Union. First, Dulaney never precisely articulates what his theory of liability is against the Union but seems to suggest the Union acquiesced in the County's discrimination. Such a claim fails because there are no genuine issues of material fact regarding whether the County discriminated against Dulaney based on a perceived disability. Even assuming factual issues existed as to whether the County unlawfully discriminated against Dulaney, an acquiescence claim fails because there is no evidence the Union played any role in Dulaney's termination. There is no evidence the Union purposefully or deliberately acquiesced in any discriminatory conduct and this case is very different from those cases recognizing such liability. *See Romero,* 615 F.2d at 1311 (finding summary judgment inappropriate where there was substantial evidence of the union's involvement in retaliating against the plaintiff based upon the plaintiffs refusal to withdraw an EEOC complaint). There is also no evidence that the Union failed to adequately represent him where Dulaney never engaged the union's representation or

requested its assistance in challenging the County's termination. Accordingly it is hereby **ORDERED AND ADJUDGED** that:

1. Defendant Miami–Dade County's Motion for Summary Judgment (D.E. 72), filed on January 18, 2011, is **GRANTED;**

2. Defendant the International Association of Firefighters, Local 1403's Motion for Summary Judgment (D.E. 74), filed on January 19, 2011, is **GRANTED;**

3. All other pending motions including Plaintiff's Motion in Limine Regarding Worker's Compensation Findings (D.E. 81) are **DENIED AS MOOT;**

4. This case is now **CLOSED.**